Ranney, J.
This cause was reserved for the purpose of settling the single question, whether the complainant is entitled to enforce a lien which he claims to the avails of the trust property in his hands, as against the defendants, George B. and Jacob Eeese, for the payment of the balance of the purchase money still due him. The facts of the case, so far as they bear upon this question, are theseIn the year 1833, Wildman & Mills, claiming to be the true owners in fee of a tract of 559 32-100 acres of land adjoining San-dusky City, sold it to Follett, Camp & Neill, for $13,983, payable in five equal annual installments, and bound themselves, in writing, to make a deed when payment was made. Soon after, the purchasers took Isaac A. Mills in for one-fourth in the purchase, and the four then stood equal owners of the interest so acquired. On August 12, 1835, Follett sold his equitable interest, with certain reservations, to' William J. Eeese, for the consideration of $35,000, which, with the exception of $393.34, was secured to be paid by five promissory notes drawn by Eeese, with Neill as his surety. A written contract, specifying the terms of this sale, was at the time executed; and at the same time Follett assigned to Eeese the written contract he held from Wildman & Mills, and, with his wife, also executed to him a quitclaim deed of all his right, title, and interest in the property. Prior to June 20,1839, a joint sale of a part *467 of the property was made to the Mad River and Lake Erie Railroad Company, and sales to other purchasers, and an amicable partition of the residue had been made amongst the several proprietors. Over $12,000 of the purchase money still remaining due to "Wildman & Mills, an arrangement was made with the Urbana Banking Company, by which the money was procured and the debt paid off, under an agreement that Wildman & Mills should convey the legal title to Eollett, in *trust—first, to convey to the railroad company the land sold to it; second, to convey to the other purchasers the lots sold to them, respectively, on payment of the balance of any purchase money remaining due; third, to raise money, by sale, mortgage, or otherwise, to pay the debt to the Urbana Banking Company; and fourth, after paying all expenses, to convey to Camp, Neill & Reese, in equal or such other proportions as they should agree upon, all the remaining interests and property thereby conveyed to said Follett. Follett accepted the trust, and received the deed from Wildman & Mills at the date last mentioned. On August 22, 1850, William J. Reese sold and conveyed, by absolute deed, for the consideration of $15,000 paid down, and which is proved to be more than their value, the specific lots set off to him in the amicable partition, to the defendants, George B. and Jacob Reese. Three of the notes, of $7,000 each, given by William J. Reese to Follett, remaining unpaid, judgments were afterward recovered against him and his surety Neill; and it is conceded that William J. Reese is entirely insolvent. Under this state of facts, it is claimed by Follett that he is entitled to retain the legal title to the property in his hands, not only for the satisfaction of the specific trusts named in the deed, but also for the satisfaction of the debt due to him upon which Neill is surety, and that the legal title can not be taken from him until this debt is paid and Neill discharged. On the other hand, it is claimed that he can assert no liens upon this property, except such as are specified in th© trust deed.
If the purchase of George B. and Jacob Reese was bona fide, and for an adequate compensation (and this is not denied), it is clear that no charge can now be made upon the property they pui-chased, that did not at the time exist as a lien upon it. The debt due Follett is for the purchase money of the equitable interest that he then held; and the first inquiry is does a vendor’s lien arise in *468 his favor? Conceding that such lien may arise upon the sale of an equitable interest in lands, it is now perfectly well settled, whatever doubts might once have been ^entertained, that the taking of personal security for the purchase money will operate as an extinguishment of any such lien. Mayheim v. Coombs et al., 14 Ohio, 428. Follett did take such security; and it necessarily follows that from August, 1835, until June, 1839, no lien for this purchase money existed upon the property, and the interest of William J. Reese in it could have been sold and transferred, free of any such charge. This position is not controverted by the complainant’s counsel; but it is insisted that when Follett was invested with the legal title, in 1839, a right to retain it until his debt was paid immediately accrued, and was subsisting at the time William J. Reese sold to George B. and Jacob Reese, and that they can stand in no better situation than their grantor. This claim is placed upon the general ground “ that one man ought not to have another’s land without paying for it,” and that “no court of equity could ever compel Follett to give up his legal title to William J. Reese until he had paid the purchase money in full.” It is very true that no man ought to have another’s property, of any kind, without paying for it, and that no person can be compelled to surrender his title to property without his consent, until it is paid for. But in this country, interests in real estate are subjects of commerce, as well as personal property; and where tho owner chooses to part with the title to his property before he receives his pay, it can scarcely be expected that tho law should, under ordinary circumstances, hamper its transmission, by following it up with liens which the owner had failed to stipulate for. It need not be feared that, in most cases, the interest of the owner will not be consulted, in determining whether the property shall go before the pay is received. In this instance, when Follett agreed to part with all his interest to one-fourth part of his real estate for the notes of Reese, secured for $35,000, the whole of which, two years before, had been bought for $13,983, and but a small part of it paid, we have no doubt that he, at least, acted very judiciously; and we see no hardship in holding that the debt was one at large, and constituted no lien upon the estate. He very correctly ^considered the notes better than his interest in the property, and consented to part with his interest and retain *469 no lien. He was competent to consent; and having done so, can not call upon a court to relieve him from it.
But the legal title to the property afterward came to his hands ; —but how? The answer is, as a trustee merely. Before this deed was made, it must be admitted that he had no interest in the land, or lien upon it. If the deed had been made to any other person, he would still have continued without any such lien or interest. All the right or interest, therefore, that he now has in or to the property, is derived under and by virtue of the trust deed. The title did not come into his hands as a matter of right on his' part, nor was it forced upon him. It was conveyed to him in pursuance of a clear and definite contract to which he was a party. By that contract he agreed to convey to William J. Reese the balance of the property that might remain, after certain specified trusts were satisfied. He now seeks to add to those specified trusts the payment of a debt to himself, not mentioned in the trust deed by which he obtained the title to the property, and which was never a lien upon it.
Since all the right and interest that Follett has to this property is derived from the trust deed, we must go to that to ascertain what interests are created by it. We find no lien there given to secure Follett’s debt, and wo can no more add it to the trust deed than we could have made the whole deed originally. Reese had a perfect right to incumber his property for the benefit of those to whom he owed debts, or to refuse to do so, and leave them to their legal remedies. Follett stood exactly in that situation. Reese did not secure him upon his property, and it was impossible for Follett to obtain such security without Reese’s consent. No equitable lien for the purchase money arose in Follett’s favor, because he saw fit voluntarily to relinquish it by taking personal security; no interest or lien in his favor was created by the trust deed, because, he saw fit, voluntarily, not only to take it without any such ^stipulation, but to agree to hold the property, and all the interest in it, for other and different purposes. We take from him no legal advantage he ever possessed ; he has himself voluntarily relinquished it. We deprive him of no right under the deed by which he holds the property ; we only refuse to aid him to commit a breach of trust, in the face of his own positive agreement.
We are referred to a class of cases where the courts have given a great advantage to the holder of the legal title, and have refused *470 to deprive him. of it in favor of one having no higher equity. We acknowledge the doctrine as founded in reason and justice, and fully sustained by authority. To give it application, however, the first indispensable requisite is, that the legal title is used to protect a specific equitable interest in, or lien upon, the property. This requisite is entirely wanting in this case; and the doctrine is sought to be extended so far as to cover the debt of a mere creditor at large, having no such interest or lien ; an application of the rule, we think, sustained by no authority. The case of Tubman v. Anderson, 4 Harris & McHenry, relied upon by the complainant’s counsel, does not in the least conflict with these views. In that case, Anderson sold to Trueman on credit, and Trueman assigned to Tubman. After the assignment, Anderson agreed to convey to Tubman before receiving all the purchase money, and to look to Trueman for it. The court very properly refused to enforce this promise, upon the ground that it was made without consideration. Anderson had done nothing to induce Tubman to purchase; he had incurred no obligations by which he had obtained the legal title; he had an unquestioned interest in the land to the extent of the whole purchase money, which could not be released by a promise without consideration. In all these particulars that case differs from this.
Follett, by the positive terms of the trust deed, had given the strongest assurance, to any one that might purchase Reese’s interest, that the land should be conveyed as soon as the other specified trusts were satisfied; by incurring the obligation to *do so, he got the legal title ; and the legal title, when obtained, covered no equitable right or lien of his in the property, for he had none.
From this view of the case, we are of opinion that Follett had no lien upon the property for the security of his debt, at the time it was sold by William J. to Geox-ge B. and Jacob Reese. It is undoubtedly true, as a general rule, that the assignee of an equity takes it subject to any claim that could at the time be made against the assignox1. In other words, “the purchaser must abide by the case of the seller.” But it is agreed on all hands, that this rule is subject to the qualification of another rulo, as stated in the case of Springle v. Morrison, 3 Litt. 52, that “ if a person having a right to an estate encourage, or even permit, a pui-chaser to buy of another, the purchaser will hold it against the person who has the right. The doctrino is founded on good x-eason, and is abundantly sup *471 ported by authority.” We have already said, that any purchaser from Reese would have a right to rely upon the terms of the trust deed; and as Follett was a party to that deed, and thus responsible for its representations, it would be very difficult to uphold any lien of his upon the property, as against a purchaser, if any had existed; but none did.
What, then, was “the case of the seller” by which the “purchaser must abide?” He owned certain property, subject to certain specified incumbrances. He also owed the complainant a debt, not secured upon the property. While he remained the equitable owner of this property, it could have been subjected to the payment of this debt, but was not. .The fact that he owed the debt, did not prevent him from selling the property. He did sell it dona fide, and received his pay for it, and the purchaser took it discharged of all incumbrances except those named in the trust deed.
We have not particularly alluded to the effect of the compromise decrees made in 1845. They certainly can not strengthen the complainant’s ease; and construing them as claimed by him, we are still of opinion that he has no lien upon the trust *property for the debt due him, as against the defendants, Geo. B. and Jacob Reese, and of course there is no right to which Neill can be substituted; and a decree will be entered accordingly.
Hitchcock, C. J., was absent.